1          UNITED STATES DISTRICT COURT

2          NORTHERN DISTRICT OF CALIFORNIA

3    Before The Honorable Phyllis J. Hamilton, Judge

4    In re DYNAMIC RANDOM ACCESS )        No. C 02-01486 PJH
     MEMORY (DRAM) ANTITRUST      )
5    LITIGATION                   )        Pages 1 - 65
                                  )
6    (All Indirect Purchaser      )        Oakland, California
     Actions)                     )        Wednesday, June 25, 2014
7    _____ )
                                  )  Indirect Purchaser Plaintiffs'
8    AND RELATED ACTIONS.         )  and Attorneys General's Joint
     _____ )  Motions for Final Approval of
9                                    Settlements, Plans of
                                     Distribution, and for Attorneys
10                                   Fees

11

12                  **TRANSCRIPT OF PROCEEDINGS**

     APPEARANCES:
13
     FOR PLAINTIFFS:        Cooper & Kirkham
14                          357 Tehama Street, Second Floor
                            San Francisco, California 94103
15                    BY:   JOSEF D. COOPER, ATTORNEY AT LAW
                            TRACY R. KIRKHAM, ATTORNEY AT LAW
16                          JOHN D. BOGDANOV, ATTORNEY AT LAW

17                          State of California
                            Department of Justice
18                          Office of the Attorney General
                            455 Golden Gate Avenue, Suite 11000
19                          San Francisco, California 94102
                      BY:   EMILIO VARANINI, DEPUTY ATTORNEY
20                           GENERAL

21

22               (Appearances continued next page)

23
     Reported By:  Sarah Goekler, CSR No. 13446, RPR
24
          Proceedings reported by electronic/mechanical stenography;
25   transcript produced by computer-aided transcription.

```
 1                    A P P E A R A N C E S (CONT'D.)

 2

     FOR PLAINTIFFS:          Strauss & Boies, LLP
 3                            4041 University Drive, Fifth Floor
                              Fairfax, Virginia  22030
 4                       BY:  TIMOTHY BATTIN, ATTORNEY AT LAW

 5

                              Zelle Hoffman
 6                            44 Montgomery Street, Suite 3400
                              San Francisco, California  94104
 7                       BY:  FRANCIS O. SCARPULA, ATTORNEY AT LAW

 8

                              Berman DeValerio
 9                            One California Street, Suite 900
                              San Francisco, California  94111
10                       BY:  CHRISTOPHER T. HEFFELFINGER,
                                 ATTORNEY AT LAW
11
                              Gross Belsky Alonso, LLP
12                            One Sansome Street, Suite 3670
                              San Francisco, California  94104
13                       BY:  MONIQUE ALONSO, ATTORNEY AT LAW

14
                              The Mogin Law Firm, PC
15                            707 Broadway, Suite 1000
                              San Diego, California  92101
16                       BY:  DANIEL J. MOGIN, ATTORNEY AT LAW

17
     FOR THE CLASS:           Gustafson Gluek, PLLC
18                            Canadian Pacific Plaza
                              20 South Sixth Street, Suite 2600
19                            Minneapolis, Minnesota 55402
                         BY:  DANIEL C. HEDLUND, ATTORNEY AT LAW
20

21
     FOR DEFENDANT MOSEL      Farmer Brownstein Jaeger, LLP
22   VITELIC:                 235 Pine Street, Suite 1300
                              San Francisco, California  94104
23                       BY:  DAVID BROWNSTEIN, ATTORNEY AT LAW

24

25
```

```
 1              A P P E A R A N C E S (CONT'D.)

 2

      FOR DEFENDANT          Farmer Brownstein Jaeger, LLP
 3    WINBOND:               235 Pine Street, Suite 1300
                             San Francisco, California 94104
 4                      BY:  WILLIAM "BUCK" FARMER, ATTORNEY AT LAW

 5

      FOR DEFENDANTS         Gibson, Dunn & Crutcher
 6    MICRON AND ELPIDA:     555 Mission Street
                             San Francisco, California  94105-0921
 7                      BY:  JOEL S. SANDERS, ATTORNEY AT LAW

 8

      FOR DEFENDANT          Kaye Scholer, LLP
 9    INFINEON:              1999 Avenue of the Stars, Suite 1600
                             Los Angeles, California  90067-6048
10                      BY:  JULIAN BREW, ATTORNEY AT LAW
                             ATON ARBISSER, ATTORNEY AT LAW
11

12    FOR NANYA DEFENDANTS:  Orrick, Herrington & Sutcliffe
                             Old Federal Reserve Bank
13                           405 Howard Street
                             San Francisco, California  94105-2669
14                      BY:  HOWARD M. ULLMAN, ATTORNEY AT LAW

15

      FOR DEFENDANT          Vinson & Elkins, LLP
16    HITACHI:               2200 Pennsylvania Avenue NW,
                             Suite 500 West
17                           Washington, D.C.  20037
                        BY:  CRAIG P. SEEBALD, ATTORNEY AT LAW
18

19    FOR NEC DEFENDANTS:    Winston & Strawn
                             101 California Steet
20                           San Francisco, California  94111-5894
                        BY:  ROBERT B. PRINGLE, ATTORNEY AT LAW
21

22    FOR DEFENDANT          Jenner & Block, LLP
      MITSUBISHI:            633 West 5th Street, Suite 3600
23                           Los Angeles, California  90071-2091
                        BY:  MICHAEL T. BRODY, ATTORNEY AT LAW
24

25
```

1              **A P P E A R A N C E S (CONT'D.)**

2

FOR DEFENDANTT HYNIX:    O'Melveny & Myers
3                        Embarcadero Center West
                         Two Embarcadero Center, 28th Floor
4                        San Francisco, California  94111
                    BY:  MICHAEL TUBACH, ATTORNEY AT LAW
5

6    FOR DEFENDANT HYNIX:    O'Melveny & Myers
                             400 South Hope Street
7                            Los Angeles, California 90071
                        BY:  KENNETH R. O'ROURKE, ATTORNEY AT LAW
8

9    FOR TOSHIBA              Latham & Watkins
     DEFENDANTS:             505 Montgomery Street, Suite 1900
10                           San Francisco, California  94111
                        BY:  BRENDAN A. McSHANE, ATTORNEY AT LAW
11

12   FOR DEFENDANT            Sheppard Mullin
     SAMSUNG:                 Four Embarcaero Center, 17th Floor
13                            San Francisco, California  94111
                         BY:  MICHAEL W. SCARBOROUGH, ATTORNEY AT LAW
14

15   ALSO PRESENT FOR         Susman Godfrey, LLP
     CELESTICA:               1000 Louisiana Street, Suite 5100
16                            Houston, Texas 77002
                          BY:  JAMES T. SOUTHWICK, ATTORNEY AT LAW
17

18                           --o0o--

19

20

21

22

23

24

25

```
 1   Wednesday, June 25, 2014                    9:05 a.m.

 2                    P R O C E E D I N G S

 3        THE CLERK:  Calling MDL case No. 02-1486, In Re:

 4   Dynamic Random Access Memory Antitrust Litigation and related

 5   cases.

 6       Counsel, please step forward and state your appearances

 7   for the record.

 8        MR. SANDERS:  Good morning, Your Honor.  Joel Sanders

 9   of Gibson Dunn for the Micron and Elipda defendants.

10        THE COURT:  All right.  Good morning.

11        MR. O'ROURKE:  Good morning, Your Honor.  Kenneth

12   O'Rourke with O'Melveny & Myers for defendants SK Hynix, Inc.

13   and SK Hynix American, Inc.

14        THE COURT:  Good morning.

15        MR. BROWNSTEIN:  Good morning, Your Honor.  David

16   Brownstein from Farmer, Brownstein, Jaeger on behalf of the

17   Mosel Vitelic defendants.

18        THE COURT:  All right.  Good morning.

19        MR. TUBACH:  Good morning, Your Honor.  Michael

20   Tubach of O'Melveny & Myers also for SK Hynix, Inc. and SK

21   Hynix American, Inc.

22        THE COURT:  Good morning.

23        MR. BREW:  Good morning, Your Honor.  Julian Brew

24   with Kaye Scholer and also with me is Aton Arbisser for

25   Infineon Technologies AG and Infineon Technologies North
```

```
 1   America.
 2             THE COURT:  Good morning.
 3             MR. FARMER:  Good morning, Your Honor.  William
 4   Farmer of Farmer, Brownstein & Jaeger, for the defendants
 5   Winbond Electronics Corporation Taiwan and Winbond Electronics
 6   Company USA.
 7             THE COURT:  Good morning.
 8             MR. ULLMAN:  Good morning, Your Honor.  Howard Ullman
 9   with Orrick, Herrington & Sutcliffe on behalf of the Nanya
10   defendants.
11             THE COURT:  Good morning.
12             MR. GRIFFIN:  Good morning, Your Honor.  Paul
13   Griffin, Winston & Strawn for the NEC defendants.
14             THE COURT:  Good morning.
15             MR. SCARBOROUGH:  Good morning, Your Honor.  Mike
16   Scarborough with Sheppard Mullin for Samsung defendants.
17             THE COURT:  Good morning.
18             MR. BRODY:  Good morning, Your Honor.  Michael Brody
19   from Jenner & Block on behalf of the Mitsubishi Electric
20   defendants.
21             THE COURT:  Good morning.
22             MR. McSHANE:  Good morning, Your Honor.  Brendan
23   McShane of Latham & Watkins on behalf of the Toshiba
24   defendants.
25             THE COURT:  Good morning.
```

1          **MR. SEEBALD:**  Good morning, Your Honor.  Craig

2  Seebald on behalf of Hitachi Limited, and I'm from Vinson &

3  Elkins.

4          **THE COURT:**  Good morning.

5      All right.  I haven't seen a lot of you in a long time.

6  Good to see you again.

7      For the plaintiffs?

8          **MR. COOPER:**  Good morning, Your Honor.  Joseph Cooper

9  on behalf of the class, the private parties.

10         **THE COURT:**  Good morning.

11         **MR. VARANINI:**  Good morning, Your Honor.  Emilio

12  Varanini on behalf of the Attorneys General.

13         **THE COURT:**  Good morning.

14         **MS. KIRKHAM:**  Good morning, Your Honor.  Tracy

15  Kirkham on behalf of the class.

16         **THE COURT:**  Good morning.

17         **MR. BATTIN:**  Good morning, Your Honor.  Tim Battin on

18  behalf of the Indirect Purchaser Plaintiffs, Strauss & Boies.

19         **THE COURT:**  Good morning.

20         **MR. MOGIN:**  Good morning, Your Honor.  Dan Mogin on

21  behalf of the class.

22         **THE COURT:**  Good morning.

23         **MR. HEDLUND:**  Good morning, Your Honor.  Dan Hedlund,

24  Gustafson Gluek, on behalf of the class.

25         **THE COURT:**  Good morning.

1      **MS. ALONSO:**  Good morning, Your Honor.  Monique

2  Alonso, Gross Belsky Alonso, on behalf of the class.

3      **THE COURT:**  Good morning.

4      **MR. SCARPULA:**  Good morning, Your Honor.  Francis

5  Scarpula on behalf of the class.

6      **THE COURT:**  Good morning.

7      **MR. HEFFELFINGER:**  Good morning, Your Honor.  Chris

8  Heffelfinger from Berman DeValerio on behalf of reseller

9  plaintiffs.

10      **THE COURT:**  Good morning.

11      All right.  I haven't seen a lot of you in a long time as

12  well.  Good to see you.

13      **MR. COOPER:**  I would add, Your Honor, that James

14  Southwick, who represents class members Celestica, who was very

15  active in the process before -- the special master is also

16  here, as is Judge Renfrew, the special master, is with us

17  today.

18      **THE COURT:**  All right.  And good morning to both of

19  them as well.

20      All right.  This matter is on for final approval of the

21  class action settlement.  I would like to know if any of the

22  attorneys or individuals who submitted objections are present

23  here in the courtroom this morning.  If so, could you stand?

24      I see none of them have appeared personally; although, I

25  have indeed reviewed the objections.

1    I'd like to start first the absence of any docket entry by

2    the defendants.  I just realized it this morning, and I looked

3    on the docket, and I didn't see a joinder.  I didn't see a

4    statement of non-opposition.  I saw nothing and have heard

5    nothing from the defendants.  So I would like to hear from the

6    defendants about this settlement.

7         **MR. SANDERS:**  Joel Sanders.  The defendants, of

8    course, fully support the settlement and support the motion for

9    final approval.  We thought that the three briefs submitted by

10   the plaintiffs fully dealt with all of the issues raised by the

11   objectors; and, therefore, we felt there was no need for us to

12   submit additional papers.  But if there is, you know, any

13   doubt -- the defendants do fully support the motion for final

14   approval of the settlement.

15        **THE COURT:**  Okay.  And Mr. Sanders speaks for all

16   defendants?

17        **DEFENSE COUNSEL TABLE:**  Yes.

18        **THE COURT:**  All right.  Thank you.  That's

19   sufficient.  You don't need to file anything.

20        All right.  So let's go forward.  There are a couple of

21   issues in addition to the objections, but let's start with the

22   objections.  I granted preliminary approval finding at the time

23   of the motion in January that the settlement, in terms of the

24   overall amount and the issues that you all dealt with in the

25   motion for preliminary approval, was certainly within the

1   ballpark of a settlement that could ultimately be determined

2   fair, reasonable, and adequate.

3       So the purpose of the final approval hearing is obviously

4   to allow the objectors -- any objectors to air their complaints

5   or grievances about the proposed settlement and for you all to

6   have an opportunity to respond and for then me to resolve

7   those.  So that's the primary focus on today's proceeding.

8   There are a couple of other things that we're going to need to

9   talk about, including the Mosel situation.  I did get that --

10  Mr. Cooper's letter about that, so we'll have to talk about

11  that as well.

12      But starting first with the three motions that were filed,

13  there's a motion for final approval of the settlement and

14  certification of the settlement class.  Another motion going to

15  the distribution of the proceeds of the settlement fund, and

16  then a separate motion going to the attorneys' fees award.

17      It was a little difficult, kind of, compartmentalizing all

18  of the objections.  They were -- some of the arguments in the

19  briefs as well as the objections overlapped on the various

20  different subject areas.  But I think it's probably pretty fair

21  to break down the objections into a couple of categories.  And

22  so we can deal with those individually.

23      Now, for the record, I did review the objections from what

24  appears to be a pro se objector, Mr. Ballick, as well as the

25  categories of objections filed by counsel on behalf of Hull,

1    Campbell, and Superoxygen.  Another objection filed by counsel

2    for Cochran, Glase, and Marcus.  Another objection by counsel

3    on behalf of Cashion, McDonough, and Kress.  Another objection

4    by counsel on behalf of Palmer and Cook, and then an objection

5    and a subsequent response by counsel for Mr. Marlow.  Those

6    were the only ones that were provided to me.  Those were the

7    only ones you all addressed.  I assume that represents the sum

8    total of objections that have been received.

9              **MR. COOPER:**  That is our understanding, Your Honor.

10              **THE COURT:**  All right.  So in looking at those

11    objections, there are essentially four categories of

12    objections, one of which can be dispensed with without any

13    further discussion, given that the objectors aren't here to

14    argue it any further.  And that's the objection about how the

15    fact that a plan of -- the plan of distribution which

16    contemplates a pro rata distribution, based upon the amount

17    DRAM purchased is somehow unfair in that it doesn't permit the

18    class members to ascertain in advance how much they're going to

19    receive.  You all have, I think, dealt with that objection

20    adequately, in that obviously if it's pro rata it necessarily

21    means there has to be claims filed before the amounts can be

22    determined.  And so many of these cases, not just antitrust

23    cases, but so many class cases are settled on the basis of a

24    pro rata distribution that it would -- I think it would fly in

25    the face of all precedent to sustain an objection on that

 1    basis.

 2         So the three main objections that are left, after I've

 3    overruled that, have to deal with the various different

 4    objections made about the distinction between class members

 5    from repealer states and non-repealer states, and that

 6    objection is expressed in various different ways, but that's

 7    essentially it.

 8         The other main objection is as to the cy pres contingency,

 9    and then there are multiple objections to the attorneys' fees

10    request.  So I'd like your comments this morning to be focused

11    on those three areas of objections so that I might resolve

12    them.

13         **MS. KIRKHAM:**  Good morning, Your Honor.  The

14    distinction between the repealer and non-repealer states is

15    couched in two ways by the objectors.  One is an objection to

16    class certification, and the other is an objection to the plan

17    of distribution.  However, principally what we have is an

18    objection to the plan of distribution because the reason that

19    the people are objecting to residents of non-repealer states

20    being in the class is because if they're in the class, they're

21    going to get money.  And in fact one of the objectors -- I

22    think it was Palmer -- is very clear about saying that his

23    objection to their being in the class, he objects to the class

24    certification insofar as it's going to pay money to those

25    people.

1    So really what we have is an objection to settling with

2   those people, to compensating them for their claims.  The basis

3   of that objection is an assumption that is erroneous, and that

4   assumption is that a resident of a non-repealer state can bring

5   no claim in this litigation against these defendants, and that

6   the objections are replete with that presumption.  That's where

7   they all begin.  They all begin with the statement, "This class

8   includes people who have no colorable claim.  This class

9   includes people who would be thrown out of court.  This class

10  includes people who have no ability to recover against these

11  defendants."  And that is not correct for -- actually, for a

12  variety of reasons, most of which were set out extremely well

13  by Judge Rendell writing for the third circuit en banc in the

14  *Sullivan versus DB Investments* case, which was the first

15  appellate court to really be faced with that question, and the

16  answer is fundamentally twofold.

17      One is that you can't tell -- even with *Illinois Brick* in

18  place, you cannot tell if someone does or does not have a claim

19  without ineffective adjudicating that issue, at least under

20  Rule 12, if not adjudicating it to a final judgment, and that

21  in a settlement context, you don't have to nor is it desirable

22  to make that adjudication.

23      And so what *Sullivan* basically said was if the person

24  coming into court can demonstrate the factual basis for their

25  claim, that being that they purchase DRAM during the conspiracy

1    period in the United States under the umbrella of the

2    conspiracy.  If they can make that allegation, then the second

3    part of their ability to recover becomes a legal question.

4    What is the law on recovery?  And the impediment to that

5    recovery is *Illinois Brick*.  It's a Supreme Court decision.

6    And what is *Illinois Brick*?  *Illinois Brick* is a decision that

7    is essentially -- by its own terms, principally a question of

8    evidence really.  It bars a certain kind of evidence.  It says

9    that where a defendant is not permitted by hand over shoe to

10   bring in evidence that the overcharge that the plaintiff is

11   claiming was passed on by that plaintiff to someone else and,

12   therefore, is not damages to that plaintiff.  If that defendant

13   is barred by that decision for making that evidentiary showing

14   in court for a reason of evidentiary convenience, litigation

15   convenience, then *Illinois Brick* says we're going to say that

16   the next person down the chain of distribution cannot take

17   advantage of the opposite side of that showing and come in and

18   prove that I was damaged because the direct purchaser passed it

19   on to me.  And that's really what *Illinois Brick* says.

20        And as the third circuit observed, it is not an Article

21   III standing case.  It has nothing to do with the jurisdiction

22   of the court.  Someone can come into court, file a claim, they

23   can say, "I'm an indirect purchaser, and I can claim because I

24   have an exception to the rule in *Illinois Brick*."  Or even on a

25   more extreme basis, someone can come into court and say, "I can

1     claim because *Illinois Brick* was wrongly decided, and it's time

2     for it to go." And I want to go all the way to the Supreme

3     Court and I want to test that out. You may, District Court,

4     have to rule against me, but that's not the same thing as the

5     assumption that somehow my claim is void ab initio so that you

6     can look at this class of people and say, "Ah, I know you live

7     in Indiana." And I can say, "You have no claim here." You

8     can't do that, and that's really what *Sullivan* talks about.

9     It's not -- that's not possible to do that, and that is the

10     fundamental flaw in all of the logic that stems from the idea

11     that you can divide the country into repealer and non-repealer

12     states.

13         It also is difficult to divide the country into repealer

14     and non-repealer states, because while there are many states in

15     which their legislature has said, "No, our antitrust laws allow

16     indirect purchasers to recover," there is no legislative

17     corollary on the other side. No legislature has ever said, "We

18     don't want our consumers to recoverer. We don't want our

19     indirect purchasers to recover." What is --

20         **THE COURT:** Under any state's law.

21         **MS. KIRKHAM:** There's no state that's ever said that

22     in the sense of their legislature speaking to it. So you don't

23     have two corps of legislative conflict, the way you do in some

24     issues where you have one state's legislature saying "A" and

25     the other state's legislature saying "B."

1    What you have is the way non-repealer states are

2    non-repealer is that their courts have said, "We have a

3    tradition of following federal law in the interpretation of our

4    antitrust laws.  And so, therefore, we're going to follow

5    *Illinois Brick*."  In some states, it hasn't even made it to the

6    highest court in the state.  It's only intermediate appellate

7    courts that have said that.

8    In many states they say that about the antitrust laws, and

9    then they say, "Oh, but our consumer protection laws don't have

10   to follow *Illinois Brick*," and people come in with the exact

11   same claim in a consumer protection context.  So it's very

12   difficult to actually -- you know, if you were tasked with the

13   job of dividing the country, it would not be the simple task

14   that the objectors make it out to be.

15   The third thing is that it isn't residency; it's the state

16   of purchase.  It's the place of injury.  So if an Indiana

17   resident comes to California and goes into the Apple store on

18   Powell Street and buys a computer, they've been injured in

19   California.  So it would have to be state of purchase, not

20   state of residency.  So you have another -- as far as

21   implementing this in a settlement, you have another complete

22   layer you would have to do, which is you'd have to ask people

23   where did you buy.

24   The net result of all of this is that, even if we're going

25   to ignore the Cartwright Act for a moment, and I'll get to that

```
 1   in a moment.  But even if we ignore the Cartwright Act, even if
 2   we assume every class member in here is claiming only under
 3   their own state law or the law of the state in which they
 4   purchased, you have the Sullivan situation, which is where the
 5   courts say, "You still can't determine that these people have
 6   no claim for the purpose of saying that these defendants can't
 7   settle with those people."
 8            THE COURT:  Of course the Ninth Circuit hasn't
 9   adopted the Sullivan approach yet.
10            MS. KIRKHAM:  No, it hasn't.  We may be it.  But many
11   of the other courts have adopted it, and Sullivan isn't
12   radical.  If you read Sullivan, the reason that I think it's
13   being adopted so widely, if you shepardize it, is because the
14   basis of Sullivan isn't anything new.  It isn't anything
15   radical.  The basis of the third circuit used to reach those
16   conclusions is very traditional aspects of standing of what is
17   Illinois Brick?  What did the Supreme Court say Illinois Brick
18   was?  What are the rules?  What constitutes a colorable claim
19   in federal court, which is any claim with a factual predicate
20   that raises an issue of law that is not wholly frivolous.  And
21   you couldn't really say that even a challenge of Illinois Brick
22   is wholly frivolous.  Half of the states have repudiated.  The
23   Canadian Supreme Court just refused to adopt it recently.  So
24   it's a decision that is not without its critics.  So you
25   couldn't say, "Oh, well, a challenge is frivolous."
```

1    So clearly under Rule 11, we have a colorable claim here

2  by every person in this case.  And the overriding commonality

3  for settlement purposes is supplied by the factual nexus that

4  each of those claimants has to the facts of the underlying

5  antitrust violation.  That is, they purchased DRAM during the

6  class period.

7         **THE COURT:**  But you're also relying upon the

8  Cartwright Act, aren't you?

9         **MS. KIRKHAM:**  We are, because we have it.  We'd be

10  foolish not to rely upon it.  We have a Cartwright Act claim

11  that has been in this case since its inception.  It isn't

12  something we thought up to justify the settlement.  It was, in

13  fact, the beginning of the case, which was to look at the

14  defendants' alleged activities, and we made allegations that

15  there was a sufficient nexus to California for those activities

16  that the law of California -- California had an interest in its

17  enforcement procedures and in providing recovery --

18         **THE COURT:**  But under *Mazda* isn't it these other

19  state's interests that's paramount?

20         **MS. KIRKHAM:**  I don't think after *AT&T Mobility*, no.

21  I think that the analysis that the Ninth Circuit did in *AT&T*

22  *Mobility*, because *Mazda* is not an antitrust case.

23         **THE COURT:**  Right.  But it is a case that's generally

24  applicable to a nation -- an attempt to obtain certification

25  for a nationwide class.

1    **MS. KIRKHAM:** It is. And I'll get to that in just a

2    second, but I think that under *AT&T Mobility* what really the

3    Court was saying there is that for the purposes of the

4    antitrust laws, you look to the situs of injury which is again

5    the point I made about the Illinois person or the Indiana

6    person comes to California and buys an Apple computer in

7    California.

8        What *AT&T Mobility* was saying is that the -- that the

9    situs of injury, if you will, is actually broad enough to

10   encompass -- that concept in the antitrust laws is broad enough

11   to encompass the site of the decisioned fixed prices and the

12   site of the implementation of fixed prices. So that when that

13   computer went out to Indiana, it went out already tainted, if

14   you will. And so when the Indiana person bought it in

15   Indianapolis, they were in fact suffering an injury that had

16   occurred in California. That's what *AT&T Mobility*, I think, is

17   saying about -- so that differentiates it a bit from the

18   non-antitrust categories.

19       So I don't know -- you know, I don't know that you have

20   the same kinds of choice of law question. But if -- even if

21   you did, the fact that what you have in this

22   non-repealer/repealer dichotomy is not -- the non-repealer

23   states have not made an affirmative decision that they don't

24   want their indirect purchasers compensated. There's not a --

25   you can't point to a legislative statement that you can say,

1   "Ah, but the intent of Indiana law is not to allow this to

2   happen.  Yes, we allow it in California, but we don't allow it

3   in Indiana."

4          **THE COURT:**  -- some of the attorneys general in this

5   action, in fact, indicate -- suggest the opposite.

6          **MS. KIRKHAM:**  That their states do not ...

7          **THE COURT:**  That their states do want their people to

8   be compensated, at least with regards to the --

9          **MS. KIRKHAM:**  Right.  Well, they're here.  Yes.  Yes.

10  They do.  And we've seen -- we've sent out CAFA notice.  Nobody

11  from Indiana showed up and said, "Don't pay Indianans."

12  There's no evidence anywhere of a -- that you have an actual,

13  in effect, conflict the same way do you in some situations

14  between legislative intent in one state and legislative intent

15  in another in this particular issue.

16         So I think even if you had to do a conflict of laws

17  analysis, which would be an incredible waste of court resources

18  in a settlement context, but in a litigation context you might

19  have to do it.  I think you would still come down -- I think

20  *AT&T Mobility*, while they were doing a due process analysis,

21  not a conflict of law analysis, but a lot of what they said

22  would be applicable if you were doing a conflict of law

23  analysis.  Plus, the absence of any kind of non-repealer state

24  commitment to being a non-repealer state, which brings me also

25  to the point that they're in flux.  States we thought were

non-repealer years ago are repealer now. By virtue of -- one,
by virtue -- actually Your Honor made the ruling -- of an
attorneys general advisory opinion.

So it's a very difficult -- I mean, it's a moving target.
You don't have a clear dichotomy of legislative or state
governmental intent on two sides of the fence. It's not --
there isn't a fence. It's kind of like putting a hubcap on a
moving car. It's always in flux. And I think that we've
established that everyone here has a colorable claim, either a
colorable claim under the Cartwright Act because you have to
say, after *AT&T Mobility*, the claim is at least colorable
nationwide, or they have a colorable claim under their own
state law, even if it's only the right to challenge whether
*Illinois Brick* should apply in their state.

So that -- that's -- that deals with the sort of class
question. And I think it also really deals with the
distribution question too. They go hand and hand. But if --
we've proposed a pro rata distribution, which a myriad of
courts have said it's kind of like the benchmark for fairness.
If you're going to treat everybody the same, it would suggest
that's the fair way to do it. We sent out CAFA notice. We
have large companies who are headquartered in repealer states
and non-repealer states who've gotten notice of this, who we
expect will be filling claim. We have no objections to the
plan of distribution from anybody with more than a $10 stake in

1  the plan.  That does say something.  The Court is entitled to

2  look at -- under the case law to look at the nature of the

3  objections.  Nobody with a major stake in cutting out the

4  non-repealer states has come in and suggested that you do that.

5  A few people with a $10 stake have suggested that you do that.

6  I think that's telling.

7      And the same thing is actually true in *Sullivan* where it

8  went up on the same thing.  None of the major jewelry stores,

9  none of the major claimants in that case objected to jewelers

10 in non-repealer states getting -- not getting paid.  Again, it

11 was the contingent of small professional objectors that came in

12 and raised the objection.  And I think you need to look at

13 that.

14      So if you have no questions, I'll move on to cy pres.

15      **THE COURT:**  Well, I think with regard to this

16 particular objection, I think you've done a good job in your

17 papers and today in explaining the distinctions between -- the

18 issues that the objectors raise, and I also think that the

19 special master's report does a good job explaining why the

20 waiting option that one of the objectors suggested was a little

21 unwieldy for a case such as this and because the class members

22 do have a colorable claim, and it does seem to me that it would

23 be unduly time consuming and probably ineffective to attempt to

24 do that sort of wading between non-repealer and repealer state

25 class members.

1    So I am prepared to overrule the objections to the extent

2    that they make an objection to either distribution or

3    certification of a class that includes class members from the

4    non-repealer states.

5    Okay.  So now we can move on to the next one.  And I'll

6    just tell you in advance, I have -- I continue to have

7    difficulty with the small claim cy pres contingency.

8    **MS. KIRKHAM:**  Okay.  There are actually two small

9    claims cy pres contingencies.

10    **THE COURT:**  Right.  It's just the upper one I have

11    the problem.

12    **MS. KIRKHAM:**  The upper one, Your Honor, we would

13    have to get 4.7 million claims between now and the 1st of

14    August to trigger that.  I don't think we're going to do it.  I

15    think it's functionally moot.  I was asked by one of the

16    defense counsel if I would actually give them an identification

17    on that point five minutes ago.  But we have as of yesterday

18    328 -- we have 328,000 claims filed by individuals online,

19    principally small claims.  Let's call them all small claims for

20    purposes of today.

21    In order to blow out the top cap, which is clearly the

22    most problematical of the two cy pres provisions in the

23    agreement, we would have to get 4.7 million new claims between

24    now and August 1st.  It's not going to happen.  We've been

25    trying to stimulate claims.  We've had Best Buy send out an

1   e-mail to its cardholders --

2           **THE COURT:**  So assuming it doesn't happen then,

3   what's going to happen to the $50,000?  As I understand it --

4   and let me, first of all, make sure I do understand the

5   different conditions.  One is if there are in excess of

6   5 million claimants, the $50 million that has been set aside

7   for small claims defined as less than $10 --

8           **MS. KIRKHAM:**  Yes.

9           **THE COURT:**  -- or $10 and less?

10           **MS. KIRKHAM:**  It's -- we do a raw pro rata.  So we

11   take all the -- we do the math and we take everybody's claim

12   and we divide it up.  We find out what is the per computer

13   equivalent unit of refund, and then we multiply it by the

14   number of claims people have claimed.  And if your number comes

15   in at $9.99 or less, you're raised to $10.  So you can be

16   raised by a penny, or you can be raised by $5.  So that's how

17   the small claim grew.  But it's the group that's getting raised

18   to $10.

19           **THE COURT:**  Okay.  So if there are in excess of

20   5 million, even if there are only 5,000,100, no one would be

21   paid any amount, and 10 million of that would go to the overall

22   pot, and 40 million would go to a cy pres recipient?

23           **MS. KIRKHAM:**  That's the way the plan provides; yes.

24           **THE COURT:**  And then if there is -- are fewer than

25   5 million, I'm not sure I understand as between the 2.5 million

1   contingency because you have one contingency.  If there are

2   fewer than 2.5 million claims, each will get $10.  And may even

3   get their actual damages and any balance between that fund and

4   the two -- and the 25 million would go to a cy pres recipient.

5          **MS. KIRKHAM:**  Right.

6          **THE COURT:**  What about in between?  What about the

7   people in between 2.5 million and 5 million?  They get at least

8   $10?

9          **MS. KIRKHAM:**  Yes.  Yes.

10      Let me give you some background.  What happened -- the way

11  we got to these -- this part of the plan was that as we were

12  negotiating the small claims portion and the larger claims

13  portion, as we were negotiating a plan.  And we said we

14  really -- you know, traditionally what's happened is the courts

15  used to drop the people off the bottom; right?  If your pro

16  rata came out to less than $10, sometimes even $25, the court

17  paid you nothing and you just gave up your claim and you were

18  considered de minimis.  And that was affirmed by appellate

19  courts all over the place; that it was fine to just not pay

20  those people.  We didn't want to do that.

21      We got the agreement of everybody at the table, including

22  resellers' allocation counsel and counsel who were at the table

23  representing the larger consumer claimants, that we would not

24  do that.  We would actually raise all those people up.  In

25  other words, if you took the time to file a claim, you'd get

 1    something back from us, at least $10.  And they said, "Okay.

 2    That seems fair."  And then the question came up, "But wait a

 3    minute.  What if, you know, half a billion of them came in?"

 4    And the larger claimants were saying that will swamp the fund

 5    because right away that upward adjustment, of course, is

 6    compensating those people percentage wise on a

 7    computer-equivalent unit like greater than Bank of America,

 8    who's just getting it straight pro rata.  So people who are

 9    talking about their interests were saying, "Well, wait a

10    minute.  We have to have some cap on this.  We can't just have

11    it completely unlimited; that any number -- half a billion

12    people could do this and swamp the funds."

13         So we said, "No, that's true.  We don't expect that."  It

14    would be, you know, catastrophically shocking to all of us for

15    that to happen.  And we were confirmed by Rust and the people

16    who do all these claims things, plus our own experience.  You

17    know, Joe and Fran have been doing these things for 40 years.

18    No one has ever seen a claims rate like that, but we said,

19    "Okay.  We'll put a provision in," and we made the cap high

20    enough that we didn't think we'd ever see that claims rate

21    either.  But at least it gave comfort to the larger claimants

22    that there was an end in sight; that if we had more than

23    5 million, we would -- we'd do something about it.  We would

24    not just keep raising them indefinitely.

25         And there were probably two things we could have done

1      about it.  We could have reduced their pro rata share, but we

2      also had people at the table who very much -- certain

3      contingency, Attorneys General in particular, who very much

4      believe that cy pres is not the pariah of the court system that

5      the objectors are making it out to be.  That it is actually a

6      doctrine that is beneficial to absent class members, especially

7      small claimants.

8          And so --

9              THE COURT:  Well, the way that you've provided

10     this -- the way that you've proposed it, you don't identify the

11     cy pres recipient.  We talked about this previous, and a number

12     of the objectors object to the fact that they haven't been

13     identified, and it really makes it difficult for me to

14     determine whether or not -- without knowing who the cy pres

15     recipient potentially might be, whether or not it really is a

16     benefit, indirect or otherwise, to a class of people to receive

17     to have $40 million.  First of all, it's a huge amount of money

18     going to a third party to this lawsuit as opposed to getting

19     $6 and not 10 or $4.

20             MS. KIRKHAM:  I will say that while we don't -- and

21     we've -- I'll get to why we didn't do it now, but it won't be

22     done without Your Honor, you know, you will approve the cy pres

23     recipients, and the cy pres recipient will be chosen with what

24     are some fairly defined guidelines that have been annunciated

25     by the Ninth Circuit.  So that if you follow those

1    guidelines -- if we follow those guidelines, we bring you

2    recipients that follow those guidelines, then it seems that it

3    pretty much follows that those recipients would be entities

4    that would convey value to the absent class members because if

5    you follow the -- that's what the Ninth Circuit guidelines are

6    designed to do.  It's designed to steer you in the direction of

7    recipients that will, in fact, convey value and --I have class

8    action settlements on my docket on a regular basis, and there's

9    a real problem in this area.  I mean, a lot of class counsel

10   are struggling to find appropriate cy pres recipients that

11   provide that driving nexus that the Ninth Circuit talked about

12   in the *Kellogg* case.

13        So just makes it -- it makes it very, very difficult.

14   Just having read the objections and having raised these

15   concerns with you all before, I'm very reluctant to approve a

16   plan of distribution.  I don't look at this as being an

17   impediment to the settlement but a plan of distribution which

18   contemplates sending as much as $40 million while permitting

19   some valid class claims to go uncompensated at all, even at a

20   minimal level.

21        **MS. KIRKHAM:**  Well, unfair as it sounds, you would be

22   on firm judicial ground by approving a settlement that allowed

23   claims to go uncompensated.

24        **THE COURT:**  Sure.  But --

25        **MS. KIRKHAM:**  I know it was the way it was always

1  done in the past really.  So the idea of the added benefit of a

2  cy pres would seem to be something that couldn't take it away.

3  The reason we didn't do the cy pres, go through that whole

4  process right now is really twofold.  One is because we didn't

5  think we were going to need it on the $40 million, and we're

6  not going to need it on the $40 million.  We're not going to

7  get -- I mean, you can lock me up.  We're not going to get

8  4.7 million claims between now and the 1st of August.  It's not

9  happening.  And it would give you some idea of who we were

10 thinking about.  But it would be an extremely costly process to

11 do that, because as you saw from the declarations that we put

12 in, to do a real cy pres distribution, you've got to know when

13 it's going to happen and you've got to know how much money is

14 going to be in it.

15      So we could do a fictitious one for $40 million, and we

16 waste a lot of time and energy and money for something that

17 isn't going be needed.  And for the bottom end residual

18 cy pres, we don't have any idea how much money it would be.  We

19 would be pulling a number out of a hat.  If we have a million

20 dollars, we'll give it here.  If we have a 15, we'll give it

21 there.

22          **THE COURT:**  So tell me what's going to happen.  Let's

23 assume you only get an additional million --

24          **MS. KIRKHAM:**  Thanks.

25          **THE COURT:**  -- between now and August --

1          **MS. KIRKHAM:**  Right.

2          **THE COURT:**  -- and you don't meet the $5 million

3     ceiling --

4          **MS. KIRKHAM:**  Okay.

5          **THE COURT:**  -- so what's going to happen with --

6     they're all going to be raised to $10?

7          **MS. KIRKHAM:**  And then until they exhaust 25 million,

8     they're going to be raised above $10.

9          **THE COURT:**  To their actual?

10          **MS. KIRKHAM:**  To a maximum of their actual or to a

11     pro rata -- somewhere between 10 and they're actual; yes.

12          **THE COURT:**  Okay.

13          **MS. KIRKHAM:**  And that's the -- you know, we really

14     hope we hit that sweet spot.  We think we will so that we will

15     have -- so that the only residual we will have will be the one

16     that always end up at the bottom of the fund, which is uncashed

17     checks and the things that you always end up with at the

18     bottom.  But we are really hopeful that we are going to hit the

19     sweet spot between the two cy pres contingencies and we'll

20     never have to bring you the identity of a cy pres recipient

21     that sacrifice the Ninth Circuit guidelines.

22          Do you want to speak?

23          **MR. VARANINI:**  Emilio Varanini, representing the

24     attorneys general.

25          We're the ones who submitted, Your Honor, two declarations

1    to you, one from my boss who sends her regrets for not being

2    able to be here today, and one from a man who we consider to be

3    the leading cy pres administer in the United States.

4        I obviously join all of the comments and points made by my

5    colleague for the indirect purchaser class.  So I want to just

6    add an additional perspective for Your Honor that we did convey

7    in the paper, which is the enormous practical and ethical

8    problems that you face, especially if you are going to follow

9    the Ninth Circuit guidelines as well as our own guidelines,

10   which we have provided to Your Honor because my office actually

11   does a lot of cy pres.  We firmly believe in cy pres.  We think

12   cy pres is perfectly appropriate under both Ninth Circuit case

13   law, as well as under California state law, and there is a

14   Cartwright Act claim here.

15       I understand one could argue with that, and some day we

16   may hear from a higher authority on that.  But the point, just

17   regardless of whether we're right or we're wrong in how we

18   interpret *Kellogg* or Ninth Circuit case law, what needs to also

19   be looked at here are the enormous practical and ethical

20   problems, especially if you're going to follow those guidelines

21   with trying to pick cy pres recipients at this point.

22       First of all, you'd have to decide okay are we really --

23   is there any chance at all we're going to bust the cap?

24   Because if we're going to bust the cap, then we have to pick

25   cy pres recipients, assuming we're going to bust the cap.  And

1    then you have to look at the other side.  Is there a risk that

2    the minimum's going be too low?  And then we're also going to

3    need to pick cy pres recipients.  Those two pots of money are

4    different.

5         And let's say we had come to Your Honor today to have Your

6    Honor pick those recipients with those contingencies that had

7    not yet materialized.  Well, there would be a problem with that

8    because we would be picking recipients at this particular point

9    in time.

10        And the problem is, by the time we get to the point that

11   we would actually have a defined sum of money, if one of the

12   contingencies was ever triggered, it could then be spent.

13   Those recipients might not be the best recipients following

14   Ninth Circuit guidelines or following our own guidelines to be

15   able to disburse the money.

16        My office in particular, we do a lot of work with trusts,

17   and we do a lot of work with grants.  And it's very clear when

18   you look at the factual submissions that we've made, that

19   picking recipients at this point in time would mean that we

20   can't follow those guidelines.  That's what our cy pres

21   administer opined, and that's what my boss who has a lot of

22   experience in grant making in a number of different settlements

23   has also opined in this case.  And that factual predicate,

24   which the special master referred to but didn't have actually

25   submitted to him at that time is an important predicate to take

1  into account here.

2      Now, one final point:  The attorneys general, we have

3  states that are strongly in favor of cy pres, and we have

4  states that are not.  Just going to be frank about it.  It can

5  be a little confusing to me which is which sometimes, which

6  gets to the whole point of not knowing a state's law.  But the

7  point is we all came together to endorse this plan that, by the

8  way, we had used in the music *CD Antitrust Litigation* that had

9  been endorsed by the district court judge there.  That was

10  affirmed by the First Circuit.

11      So this contingency plan with the idea of picking cy pres

12  recipients later, if either one of the contingencies was ever

13  triggered, isn't new.  This is something that we've gone with

14  before that we went with back in 2000, and that, again, was

15  ultimately approved by the First Circuit in that case.

16      So if there are any questions that Your Honor has about

17  the factual submissions that we've given to you or anything

18  else with respect to cy pres, I'm happy to answer that on

19  behalf of the attorneys general.

20          **THE COURT:**  No.

21          **MR. VARANINI:**  Thank you, Your Honor.

22          **MS. KIRKHAM:**  I will say one thing about the bottom

23  end cy pres, the residual cy pres.  The scenario that we have

24  there is, in fact, exactly what was in the *Rodriguez* case in

25  the Ninth Circuit.  And the *Kellogg* decision, the -- when they

1    pulled *Kellogg* back and reissued *Kellogg*, it was to explicitly

2    state that they were not overruling *Rodriguez*, and there we had

3    the same kind of thing.  If people were going to get

4    compensated, there was a set amount of fund.  People were going

5    to get compensated full damages.  If there was a residual, it

6    was going to go out cy pres.

7         **THE COURT:**  All right.  Let me make sure I understand

8    then.  With regard to the second option, if there are fewer

9    than 2.5 million claimants, which it sounds to me you

10   anticipate, the claimants will receive $10 as the minimum but

11   could indeed be compensated to their full actual damages?

12        **MS. KIRKHAM:**  Yes.

13        **THE COURT:**  All right.  And if that doesn't exceed

14   the 25 million, whatever balance is left is the smaller amount,

15   that will go to cy pres.

16        **MS. KIRKHAM:**  That's the way the plan works; yes.

17        **THE COURT:**  And am I to assume that the other

18   25 million goes to the pot?

19        **MS. KIRKHAM:**  Yes.  It stays in the pot.

20        **THE COURT:**  It stays in the pot.

21        **MS. KIRKHAM:**  It is a one-pot distribution.  We

22   didn't think we needed to make that clear.  These aren't really

23   slop-over provisions.  There's just one pot.  And we have some

24   ways of carving out a piece of it, in a sense.  Yes, everything

25   stays in the pot.  Nothing goes to the defendants, nothing goes

1  to anybody else.  It stays in the pot and goes out pro rata.

2          **THE COURT:**  All right.  Is that it on the cy pres?

3          **MS. KIRKHAM:**  Unless you have more questions.

4          **THE COURT:**  No.  I was actually considering just not

5  approving that particular provision, but I was a little

6  surprised to hear that you've only received 328,000 claims.  So

7  I -- you're probably correct that there's no real danger of

8  your exceeding 5 million.  So there's probably not going to be

9  the need for a $40 million distribution to a cy pres, which I'd

10 have a real hard time approving if the other -- if the

11 claimants got nothing.  But it sounds to me like the -- if the

12 numbers end up where you think they might, that the claimants

13 will actually end up in a much better position than they

14 otherwise would by being compensated so fully.  So that sounds

15 like that would work.

16     Now, what do you contemplate in terms of how this is wound

17 up?  I mean, we are -- it's a contingent reversionary

18 provision.  We can only figure out what it's going to be after

19 the claims have already been received.

20     How is this going to be brought back before me, assuming

21 that a cy pres designee has to be made for either the smaller

22 amount or the larger amount?

23         **MS. KIRKHAM:**  Well, we'll be coming back to you.

24 This isn't actually farewell.  We'll be coming back to with --

25 you know, there are some decision points along the distribution

1  path that you will be getting.  So we'll be filing things with
2  regard to the distribution.  If you assume that we have no
3  appeals, we'll be moving along relatively quickly to, you know,
4  finish claims on August 1st.
5      We would then -- the claims administrator would then be
6  running the numbers.  We then would know where we were.  And we
7  would submit to you certainly a report on the implementation on
8  the plan of distribution, whether you'd have to sign an
9  order -- I'm not certain.  I don't want to speak to that.  But
10  in any event, we would be submitting a report to you.
11      If we come up with, then, the question of having a -- the
12  need for a spry recipient on the bottom end, we will come with
13  you with having done the work to identify recipients that now
14  knowing the amount of the money and knowing presumably when
15  we're going to be able to pay it out.  If we're in front of the
16  Ninth Circuit, we'll have a longer time frame.  If we're not,
17  it'll be a shorter time frame.  But we would then look for
18  cy pres recipients with the help of experts and the people who
19  are in that business, and we would come to you say, "Okay.
20  Here's what we've got:  We are paying everybody their maximum.
21  We've got $11 million -- we've got $7 million."  Let's be more
22  realistic.  It's not going be as high as 11-.  "We have 5- or
23  $7 million."  We think that providing Internet access to
24  underserved communities is within the Ninth Circuit guidelines.
25  Here are the people.  Here are the grants.  Here's how it will

1    work.  And you'll say, "Mm, no."  Or you'll say, "Oh, great."

2        So it'll come back to you.  We will publish that on the

3    website so that if someone wants to come in and say their peace

4    about it, "I don't believe in Internet access.  I don't believe

5    in public education," or whatever it would be, they can come in

6    and do that.

7            THE COURT:  That was my next question:  How would you

8    notify the class?

9            MS. KIRKHAM:  Publication on the website.

10       Obviously, anyone who's already objected -- there's some

11   question about whether -- where the objection period comes and

12   goes.  Can we get new objectors in?  I would probably not

13   object to any person coming in, personally.  But the people who

14   have objected already are going to get served with whatever we

15   file --

16           THE COURT:  Okay.

17           MS. KIRKHAM:  -- because they already get served with

18   whatever we file in court.  And we would publish -- we post

19   things on the website as they sort of happen anyway.  And we

20   would post that on the website so that people could read it and

21   see what they think.  So it would be website.  We're not going

22   to spend another billion sending mail, you know, public notice.

23           THE COURT:  All right.

24           MS. KIRKHAM:  So, yes, there would be notification,

25   and there would be filling, and you, Your Honor -- you would

1    have to approve the cy pres recipients obviously.

2            **THE COURT:**  All right.  I am -- along with that

3    explanation, then I am prepared to overrule the objections.  I

4    think the objections were valid ones, however.  But I do think

5    that what you contemplate occurring is likely to -- in order to

6    benefit of the class at a much higher level than it would be

7    had we just done away with the contingency and sent checks to

8    everyone for $1 or $2.  This could be a much better result.  So

9    on that basis, I'll overall the objections.

10        All right?

11           **MS. KIRKHAM:**  Unless we come to attorneys' fees.

12           **THE COURT:**  Right.

13           **MS. KIRKHAM:**  The objections to attorneys' fees --

14   actually, I'll make a general observation.  One of the things

15   that struck me about all of the objections was that there was

16   very little that was fact specific in the objections.  Almost

17   all presented you with a question -- in effect, a question of

18   law.  And that is also very true of the attorneys' fees.

19        There are only -- there's really only one alleged fact

20   upon which the attorneys' fees objection is based, and that is

21   that the attorneys general did all the work, and we followed

22   along.  But that is the only factual objection to the

23   attorneys' fees.

24        The other objection to the attorneys' fees is sort of

25   "Lodestar cross-check go away."  You just can't give 25 percent

1    in a $300 million case, as a matter of law.  And that is not

2    the law in the Ninth Circuit.  It's actually not the law in any

3    circuit.  But it's certainly not the law in the Ninth Circuit.

4        The law in the Ninth Circuit is that you use the Lodestar

5    cross-check as a check on the benchmark fee.  You adjust it

6    upward or downward, depending on how the Lodestar cross-check

7    comes out, essentially.  And the objective in every case from

8    the $2 million case to the $200 million case to the

9    $2 billion case is to arrive at a fee that represents fair and

10   adequate compensation to the counsel and fair and adequate

11   payment by the class -- or the clients of the counsel.  And

12   there is no mega fund.  There is no rule that suggests that you

13   don't apply that same rubric all the way through.

14       And if you do apply the rubric all the way through, you

15   don't come up with an unjust.  There's no need for some sort of

16   special rule in big cases, because if what's happened is that

17   the size of the fund is so great that it was generated purely

18   by the circumstances of the case, the Lodestar cross-check is

19   going to create a multiplier of 10 or 12 or 15 or 20, because

20   that's how you compare the effort that counsel put in effect

21   with the result in the case.

22       So here we have a situation where we are because of a

23   negotiation we did among counsel and with the attorneys

24   general, we are asking for a fee that is not generating a

25   multiplier of 1; it's generating a negative multiplier.  And

1    that in and of itself should be enough to do away with all of

2    the objections that are based on the size of the fund.  Since

3    you don't have the law that tells you there's a different

4    benchmark for big funds, which you clearly don't in this

5    circuit, and you apply the law of this circuit, you get a

6    result that tells you that the benchmark in this case is

7    eminently fair to the class.  If it's unfair, it's unfair to

8    us, but we limited ourselves to it.

9        The only other real objection they make to the attorneys'

10   fees is that you should look at line-by-line time sheets; that

11   somehow you cannot make a determination if you don't look at

12   our time sheets.  And there are two answers to that.  One is

13   that that isn't the law in the circuit because under the

14   percentage of the fund doctrine, if you were going to look at

15   time sheets, you might as well do a Lodestar analysis.  It

16   actually obviates all of the benefits of the percentage of the

17   fund doctrine.  If you're going to look at my time and compare

18   it to ten other peoples' time on that day.

19       But here what the special master said was, if I looked at

20   their time sheets, and I determined that 70 percent of their

21   time was duplicative and wasteful, and I paid them on

22   30 percent of their time with the 25 percent fee, they get the

23   same multiplier that the direct purchasers got in this case, a

24   2.5, which is right in the sweet spot of multipliers, if you

25   look at cases all over the country.

1      So -- and then the special masters -- and I know most of

2  these people a majority of the Lodestar was incurred by the

3  leadership group of the private plaintiffs and the leadership

4  group of the attorneys general.  I know them.  I don't have to

5  look at their time sheets to know they are honest, efficient,

6  hardworking people.

7           **THE COURT:**  I have boxes and boxes of somebody's time

8  records.

9           **MS. KIRKHAM:**  Well, you don't have line-by-line; you

10  have summaries.  You would have more boxes than you can begin

11  to imagine if you had line-by-line time sheets for this case

12  over the -- this case is, what, 12 years old?  There are

13  children who grew up in this case.  You'd have more boxes,

14  trust me.  And it would be years before you could make a

15  decision, if you were really going to do that --

16           **THE COURT:**  So the materials that were supplied to my

17  chambers in conjunction with the special master's report

18  contain the summaries --

19           **MS. KIRKHAM:**  Yes.

20           **THE COURT:**  -- of the billings from the various

21  different firms?

22           **MS. KIRKHAM:**  Right.  Right.  What the special master

23  said is -- he looked at the description of what people did.  He

24  looked at the docket of the case, what went on in the case; the

25  motion practice, the discovery.  He looked at discovery, he

1   looked at -- and he said, you know, "Yes, it takes this much

2   time to do these things, in my opinion, in my experience."  And

3   that's basically how he arrived at it.  He looked at what we

4   said we did.  He looked at the amounts of time.  He looked at

5   the various firms that were incurring the time and he said,

6   "Yes, in my experience, it appears to be reasonable."  He did

7   not say, "Let's see on June 25th, 1999 or 2004, 2005 -- let's

8   see.  Well, we had -- Fran Scarpula was doing this, and Tracy

9   Kirkham was doing this."  He didn't do that.  And that's the

10  analysis the objectors are asking you to do.  But it's a

11  purposeless analysis in this case because you could disallow --

12  if you --

13          THE COURT:  Well, generally, in a fund case, I don't

14  look at anything other than the kind of records that you all

15  have submitted, which are sufficient.  I mean, the summaries, I

16  think, are sufficient for a Lodestar when used solely as a

17  cross-check.  We're not forming a Lodestar function.

18          MS. KIRKHAM:  Well, that certainly is what the Ninth

19  Circuit has told you you're entitled to do, and that's the

20  purpose of doing it this way, is that do you don't bog down for

21  a year deciding whether someone should have, you know ...

22          THE COURT:  Okay.  Why don't I get to the only real

23  objection that -- and I'm not even sure that the objectors

24  raised it specifically, but I know I raised it with you all

25  again.  And now that I've taken a second look, I still have an

1    issue with it, and that is the reseller attorneys' fees and the

2    Celestica attorneys' fees.  They're added in to the expenses.

3    I'm not sure.  Is it the --

4           **MS. KIRKHAM:**  It's our expenses.

5           **THE COURT:**  Does it come out of your pot of expenses,

6    the indirect purchaser pot, not the AG pot; correct?

7           **MS. KIRKHAM:**  Right.  Here's how --

8           **THE COURT:**  And so the problem I'm having is that --

9    and I think I said this at the last hearing -- that seems to me

10   to be attorneys' fees and not the kind of expenses such as

11   expert fees or consulting fees, et cetera, that would

12   necessarily be characterized as expenses.  It seems to me that

13   it's attorneys' fees, and that what you all have done is

14   essentially requested more than the 25 percent, granted it's

15   only 25.2 percent, but it's really more than the 25 percent in

16   fees to cover the fees of reseller counsel and Celestica's

17   counsel.  And you've simply characterized it in a way in which

18   it doesn't come out of that 25 percent.

19       That's what it seems to me that's occurred.  And my

20   problem is I certainly do not want to set a precedent on -- in

21   any cases on my docket for allowing counsel to recharacterize

22   attorneys' fees as expenses.

23           **MS. KIRKHAM:**  I can understand that.  Sort of two

24   things -- one thing to say.  One thing, as a general matter,

25   it's an interesting sort of kind of attorneys' fee, though;

1  right?

2          **THE COURT:**  Right.

3          **MS. KIRKHAM:**  It's not an attorneys' fee -- it's not

4  someone who worked on the case, so we're going to put them out

5  there.  It is a -- it is someone who was -- one group was

6  indicted in by the special master; that would be Celestica's

7  counsel because letters were sent out soliciting resellers --

8  major resellers to please sort of send your lawyer in.  The

9  other was actually appointed by the special master, and there

10  are cases that treat consultants to the special master, whether

11  they be attorneys or not, as a cost.

12          **THE COURT:**  But they didn't just consult, though.

13  They represented the interest of the reseller agreements during

14  the course of settlement negotiations; correct?

15          **MS. KIRKHAM:**  They -- yes, they were at the table.

16  They --

17          **THE COURT:**  Did they enter an appearance on the Court

18  docket?  I didn't check, but ...

19          **MS. KIRKHAM:**  I don't think so.

20          **THE COURT:**  As representatives of any of the parties?

21          **STPHAO:**  No, I actually don't think they did.

22          **THE COURT:**  Nichole, can you pull up the docket.

23          **MR. VARANINI:**  If I may, Your Honor.

24      The resellers' counsel in this case have never, insofar as

25  I know, appeared in front of this Court, and that's for a very

1    simple reason --

2              **THE COURT:**  Who's reseller counsel?  Is that

3    Mr. Heffelfinger?

4              **MR. VARANINI:**  Yes.

5              **THE COURT:**  Weren't you here not long ago.

6              **MR. HEFFELFINGER:**  For the preliminary approval

7    hearing in January.

8              **THE COURT:**  That was it?

9              **MR. HEFFELFINGER:**  That was it.

10             **MR. VARANINI:**  To put it another way, the special

11   master with obviously all of us approving here, both attorneys

12   general and the indirect purchaser plaintiff class, we

13   basically hired them as experts.

14       We hired them to represent an interest, the reseller

15   interest, so that we could ensure that everybody's interest

16   were fairly represented.  Because if we didn't do that for

17   purposes of settlement allocation, not for purposes of

18   negotiating the settlement -- the resellers had nothing to do

19   with that at all.  They've had nothing to do with the

20   litigation in this case.  They wouldn't be here at all if it

21   wasn't for the need in terms of devising the settlement

22   allocation plan to ensure that all of the interests have a seat

23   at the table.  That's required by the case law.  That was the

24   very first thing or almost the very first thing, if I recall

25   correctly, because I'm getting a little old here, having been

1    in this case for a long time.  I think when I first appeared in

2    front of you, I didn't have the silver in the hair, and now I

3    do.  But that's one of the first things the special master

4    wanted addressed because he wanted to make sure in any

5    distribution plan that was crafted that the interest of

6    everybody were represented.  That's not the typical sort of

7    attorneys' fees with people appearing in front of you that you

8    normally deal with.  That is counsel being brought in for a

9    purpose related to settlement allocation to aid in the crafting

10   of a distribution plan by making sure that a particular

11   perspective is represented.

12       I mean, normally, as Your Honor is more aware than I,

13   given your docket, you know, attorneys go in front of you

14   because they're like, "Look.  I've spent my whole life

15   litigating the case, and I need to get something back, and

16   that's what the case law allows, and so here are my amounts."

17   And Your Honor goes through the analysis that Your Honor just

18   went there in terms of, "Okay.  Does the attorney get something

19   back or not for the time they spent litigating the case?"

20       This is different.  This is no different than let's say

21   hiring the special master himself and paying the special master

22   to oversee the settlement allocation process or for us having

23   submitted expert analyses in conjunction with the settlement

24   allocation process.

25       So they're not fulfilling the typical role of counsel in

```
 1   the adversarial setting that, for example, we had with defense

 2   counsel before we all settled.  And that was why it was our

 3   feeling -- and the attorneys general joined in this -- that it

 4   was appropriate for the resellers actual -- their actual

 5   expenses.  So what they actually spent in attorney time on the

 6   case as opposed to what they could have actually asked for with

 7   whatever multipliers that might have asked for.  It was

 8   appropriate to come to Your Honor and characterize that as an

 9   expense and not as part of attorneys' fees.  It's in its unique

10   category by itself that is required pursuant to case law

11   under -- and with respect to settlement allocation.

12              THE COURT:  Okay.  Did you see Mr. --

13              THE CLERK:  Mr. Heffelfinger is not listed on the

14   docket, but he did make an appearance at the last hearing.

15       And what was the other name?

16              MS. KIRKHAM:  Southwick.

17              THE COURT:  Southwick.

18              MS. KIRKHAM:  Mr. Southwick.  He represents

19   Celestica.  I don't believe he's even spoken in the courtroom.

20              THE COURT:  Is he here?

21              MS. KIRKHAM:  He is here.  There he is.

22              MR. SOUTHWICK:  Your Honor, I'm Jim Southwick.  I

23   represent Celestica.  I have not appeared in this case.  I've

24   never been to your court before.  I did, on invitation to my

25   client, appear at several of Judge Renfrew's special master
```

1  proceedings.

2      I don't think I have a lot to add to what's been said

3  already --

4          **THE COURT:**  Why don't you come up here so that the

5  court reporter can hear you.

6          **THE CLERK:**  He's not on there.

7          **MR. SOUTHWICK:**  I'm not even admitted in this court,

8  Your Honor.

9          **THE COURT:**  You can still speak.

10         **MR. SOUTHWICK:**  I think the way that the fees of my

11  firm and the expenses that my firm incurred that have been

12  treated in the papers, I think, is fair and correct.  And I

13  fully support what Ms. Kirkham and Mr. Varanini said.

14         **MR. HEFFELFINGER:**  Your Honor, very briefly.  Again,

15  Chris Heffelfinger on behalf of the other resellers other than

16  Celestica.  We were brought in, as I mentioned during the

17  preliminary approval hearing, at the request of the parties.

18      And I'd say just briefly not much more to add than what

19  Mr. Varanini has added.  He's adequately described it.  But our

20  role was to come in essentially to see what sort of softness

21  there was in some of the other expert reports, and then to hire

22  our own expert essentially to look at the regression studies

23  that have been done and test those variables and engage in a

24  dynamic to see how much absorption there should be at the

25  reseller level.  And that -- there was a series of discussions.

1   And ultimately in those discussions, the current plan sort of

2   arose out of the arguments over how much should be retained at

3   the reseller level.

4       Just to put the expenses in perspective, for example, our

5   firm 189,000 had to go to the hiring of our expert Gary French

6   from Nathan & Associates, and our fees at that time were -- at

7   this time were 250,000.

8       So, again, we came in in 2011, attended a series of

9   meetings that I'll say the first meeting was hosted at

10  O'Melveny & Myers.  When I heard that the passthrough rate was

11  100 percent or more, I thought for a moment we might have to

12  write a check to them for the difference.  But over time we

13  were very pleased with what the result has been.  And it's

14  been, I think, in large measure due to Judge Renfrew's very

15  able ability to bring the parties to the table and get them to

16  examine their positions carefully.

17      Thank you, Your Honor.

18          **THE COURT:**  I think your firm, though, is on the

19  docket.

20          **MR. HEFFELFINGER:**  We are on the docket in the

21  original direct case, Your Honor.  I was one of the counsel in

22  the direct cases, and that settled a number of years ago.  So I

23  think in one respect that's why I was brought in on this since

24  I had some prior familiarity with the DRAM case, and I'd also

25  done the same function in the SRAM case a couple -- a few years

1    ago as well.

2         Thank you, Your Honor.

3         **THE COURT:**   Okay.

4         **MS. KIRKHAM:**   I would just like to clarify one thing.

5    I know one of the objectors kind of bollixed up in the

6    objection, and just so there's no confusion, there was no

7    separate representation of anyone in the settlement negotiation

8    process or in the litigation process before Your Honor.

9         The first place that we came into where there -- were

10   these two counsel, Celestica's counsel and Berman DeValerio

11   brought in, was well into the special master proceedings.  And

12   it was when we had to -- when we had to deal with fact that in

13   the litigation before Your Honor class counsel had taken the

14   position because we had asked for certification of a class that

15   did not include resellers.  We'd taken the position in writing

16   that there was 100 percent passthrough.  And the question then

17   was, how now do we deal with this, because the settlement is

18   broader than that.  Do we just pick a couple of lawyers?  You

19   know, "Fran, you do it."  Which could have been done.  But that

20   didn't make the special master very comfortable.  We thought

21   that that would probably lead to some problems today.

22        And so the decision was made that the special master

23   would, in fact, request and appoint counsel to almost -- in

24   some sense, as a friend of the court sort of and take this

25   other position and bring this other evidence before the special

1    master.  So I think it's a unique situation.  I think also just

2    in -- you know, if you lump this counsel in with the other

3    group, you're going to, in some respects, skew a little bit the

4    Lodestar cross-check.  Do you -- these people aren't getting a

5    multiplier; are they getting the haircut?

6         I mean, I think this case has a lot of unique reasons to

7    treat it this way, not the least of which is the negative

8    multiplier that is going into the class counsel.  So I think

9    that -- I mean, if you wanted an order that -- you know, us to

10   resubmit an order that sets that out a little more carefully,

11   but I don't think you're setting a precedent here by accepting

12   the procedure the way we've put it before you.

13        **THE COURT:**  I don't think that I am comfortable

14   approving it as you've currently proposed it.  However, I do

15   understand and appreciate the role is different than your role

16   is and the counsel sitting around counsel table.  I mean, they

17   were not representing on the same level that you were

18   representing the class.

19        I think that I would be more comfortable in approving -- I

20   believe your papers indicate that -- that the amount going to

21   the additional counsel represented .2 percent of the overall

22   amount of fees that are requested.  I would approve a

23   25.2 percent attorneys' fees so that they're compensated out of

24   that amount.  Because even though you say it won't set a

25   precedent, I'm sure someone will walk in here next month and

1   ask for the same thing.

2            **MS. KIRKHAM:**  Okay.

3            **THE COURT:**  All right.  So that takes care of the

4   major categories of objections.  There were subtleties within

5   each of those main categories, but I think that we've pretty

6   much covered them all, and so I am comfortable in overruling

7   the objections.

8        As I said, there were a couple of other things that we

9   need to address before I can grant final approval.  And that --

10  one has to do with Mosel.

11           **MS. KIRKHAM:**  I'm going to vacate the lecturn for

12  Mosel.

13           **THE COURT:**  All right.  So why wasn't this whole

14  issue raised until two days before this hearing, given that

15  payments were missed earlier this year?

16           **MR. COOPER:**  The payments were missed, Your Honor,

17  after the preliminary approval hearing.  And in the period

18  since then, we've been trying to negotiate some arrangement

19  whereby we can have some security that the funds ultimately

20  would be paid.  We still don't have a final agreement that can

21  be signed, and so -- although we believe we have one in

22  principle, but there are still a few loose ends.  And if for

23  some reason it did not ultimately come to an agreement that we

24  could sign, then we would be left with executing on the

25  judgment -- we already have a judgment note.  We would be left

1   to execute on that.

2        It was our feeling that that was not the preferred way of

3   proceeding; that we were better off to get an agreement with

4   Mosel and with its 11 banks that provide some hope that we will

5   actually get the money, most of the money, and allow us to

6   proceed not reverting to litigation before Your Honor because

7   the settlement was --

8            **THE COURT:**  But what I don't understand is, how does

9   this proposal affect the settlement?  There's a 1 percent, the

10  amount that Mosel --

11           **MR. BROWNSTEIN:**  Just a little less than one percent,

12  Your Honor.

13           **THE COURT:**  -- is going to chip in.  Is it less than

14  1 percent?  How does that affect the overall distribution?  I

15  mean, it's going to be paid over years now; right?

16           **MR. BROWNSTEIN:**  Correct, Your Honor.

17       By the way, David Brownstein for Mosel.

18           **THE COURT:**  All right.  Good morning.

19       So how is that going to be paid to the class who, I am

20  assuming, is going to be paid fairly quickly?

21           **MR. BROWNSTEIN:**  Well --

22           **THE COURT:**  Just how's it going to work?  Are people

23  going to get a check for 10 cents ten years from now when --

24           **MR. COOPER:**  I think the honest answer is we don't

25  have an answer to that at this point in time.

1    We had hours and hours and hours of discussions about the

2    time period, the five years, the proposal that it be longer,

3    seven years.  The negotiation was extended and complicated on

4    Mosel's part at least because of the need to get approval from

5    11 banks who have differing views.  We felt that with the --

6    Mosel has brought itself current with its obligation other than

7    the settlement principal amount.  As we've said, they've given

8    us over $400,000.

9    So we would envision that the settlement would be

10   approved, and we would then set about either receiving the

11   funds or deciding on some recommendation to Your Honor at the

12   point in time that we need it had funds for distribution,

13   assuming it doesn't take the five years, as to what we do.

14   There are many options.

15   If -- for example, if there are in fact cy pres

16   recipients, those funds that would come at a later time could

17   be used for cy pres and would not affect the distribution to

18   claimants.

19   **THE COURT:**  Does the full settlement amount, which

20   amounts to about $220 million or thereabouts, after --

21   **MR. COOPER:**  After fees.

22   **THE COURT:**  -- after fees and expenses, does it

23   include the amount that --

24   **MR. COOPER:**  It does, Your Honor.

25   **THE COURT:**  It does?

1          **MR. COOPER:**  Yes, it does.

2          **THE COURT:**  All right.  So obviously, some of the

3    class members are going -- their amounts are going to be

4    reduced by something less than 1 percent because they're not

5    going to be able to share in Mosel's contribution or it won't

6    be available to distribute when you distribute the rest of the

7    fund.

8          **MR. COOPER:**  Well, it's certainly possible that some

9    of it would have been received and some of it not have been

10   received.  They're supposed to make payments starting --

11   quarterly payments starting 30 days from today.  So that first

12   payment would have been received.

13         At the point in time when we're actually ready for a

14   distribution and you need to plug into your formula the amount

15   that needs to be spread because that amount will change with

16   whatever expenses there are and interest that might be earned

17   and as the claims are validated, then we'll ultimately get to

18   the point where we'll say that the share of a particular

19   claimant is -- you can compute the pro rata share and you have

20   to say pro rata share of what amount.  The amount will or won't

21   include all of the Mosel money.

22         So if there's still an outstanding balance let's say of

23   50 percent of the Mosel money, then we'll have to determine

24   what happens with that.  Do we -- what do we do with the other

25   50 percent of the funds that have not been received?  And

1    that's what I'm saying.  There are a variety of things --

2    thoughts that we've had.  But until we see where we are, we

3    won't know what -- as I said whether we might want to give --

4    designate those funds still to be received from Mosel.

5         **THE COURT:**  Let me ask it a different way:  At the

6    time that you're going to make the distribution, let's assume

7    that there's some amount that's still outstanding for Mosel, do

8    you contemplate reducing the pro rata share across the board

9    for everyone, even the small claimants, by the amount that is

10   outstanding for Mosel?

11        **MR. COOPER:**  We would not reduce the small claimant

12   amount because those are specific different provisions.  The

13   question is what would you do in computing the pro rata share

14   for --

15        **THE COURT:**  For the larger.

16        **MR. COOPER:**  -- the larger people?

17      One thought that we've had is that at that time, in order

18   to get certainty of the amount, we might -- because there's a

19   market for these types of obligations.  We might want to sell

20   the obligations so that we can convert it to KS, presumably at

21   a discounted amount, but have certainty of how much amount

22   there is.

23      Another thought, as I said, was if there's still amounts

24   to be received and there is a cy pres program, we could -- we

25   would make out computation based on the receipt of the funds,

1   but those funds that would be -- that are yet to be received

2   would be used for a cy pres purpose if and when received.  And

3   there are, I'm sure, multiple other options that might be

4   available to us.  We don't know when we'll need the funds for

5   purposes of distribution because we don't know if there'll be

6   appeals.

7        If there are appeals, the period of time before we need

8   the funds is different than otherwise.  We've talked to Mosel

9   about the possibility of accelerating the payments if we need

10  it or having some types of rights for acceleration.  We've

11  really not been able to reach an agreement on how and when that

12  might happen.  But what we do know is that the options

13  available to us now don't seem very appealing other than to try

14  to collect the money and hope that we'll get it or find a way,

15  when we need the funds, to have received most if not all of it.

16            **MR. VARANINI:**  If I could add one point, Your Honor.

17       It's not just Mosel we have to deal with here.  It's --

18  there are 11 creditor banks that were set up as a type of

19  creditors' committee, but this was done pursuant to a Taiwanese

20  government initiative.  So they're not parties to the case, but

21  they control literally the outsource of Mosel funds.  Mosel has

22  to get permission from them for everything.

23       Two years ago when we looked at this and agreed to the

24  judgment note and to the situation that we now find ourselves

25  in in front of yourself, we look at their financial condition,

1    and we thought at that point it looked so good that the

2    creditor banks would have no incentive to block.  It turned out

3    we were wrong about that.  Their financial condition is still

4    good enough that we're confident we're going to get the

5    payments that are actually set out in the payment plan on which

6    we have an agreement in principle, and that includes

7    specifically my group with whom I talked about this.  But the

8    problem is that their flow isn't so good that they can ignore

9    the 11 creditor banks that control the outflow of cash.

10            So what makes this agreement different and worth it, with

11    the admitted difficulties that Your Honor has outlined, is the

12    fact that the creditor banks have now made specific

13    representations to Mosel that are going to be part of the

14    agreement that they have made these representations that they

15    will allow Mosel to make the payments.  Since Mosel's overall

16    financial condition would allow these payments to be made, we

17    believe that will solve the problem for everyone.  So unlike

18    Mosel's other creditors, we're not taking a 25 -- 25 percent to

19    50 percent haircut.

20            **MR. BROWNSTEIN:**  30 to 70 percent.

21            **MR. VARANINI:**  30 to 70.  Sorry.  I'm not the world's

22    greatest with numbers.  30 to 70 percent haircut.  We've got --

23    we're getting most of it and a possibility of -- a good

24    possibility of getting all of it.  It's just spread out over

25    time.

1    And as my colleague already outlined far more persuasively

2    than anything I could say, we just have to wait and see when

3    the money's going to be available for distribution, and the

4    attorneys general joined in direct purchaser class in telling

5    Your Honor that we're going to do everything possible to ensure

6    distribution happens in a normal way so that nobody has to be

7    aggrieved by the fact that we're getting Mosel payments over

8    time.

9        **THE COURT:** Well, I think that you allay some of my

10   concerns when you tell me that it won't affect the small

11   claimants; they can be paid the full amount of their pro rata

12   share immediately. It seems to me that the larger claimants

13   are in a better position to absorb whatever --

14       **MR. COOPER:** And a second payment if money comes in,

15   they have to be made a first -- a distribution is one of the

16   options that we've considered as well.

17       We might -- it's not uncommon that you have more than one

18   distribution. And there have been cases where the people who

19   received the second distribution are a small group of people,

20   the largest claimants who -- for whom it makes sense to cut a

21   check. It wouldn't make sense to cut 300,000 checks for the

22   share of Mosel. So you would pay those people off and perhaps

23   many, many other people, the total amount of the recovery. And

24   then the --

25       **THE COURT:** Right. And actually I think that's

1    preferable to a further cy pres designation as well.

2           **MR. COOPER:**  I didn't contemplate it being a further

3    cy pres when I was saying that.

4           **THE COURT:**  You thought it would be part and parcel

5    of anyone that's determined to be needed after --

6           **MR. COOPER:**  If there is one.

7           **THE COURT:**  But this could take five years; right?

8           **MR. COOPER:**  It could, Your Honor.

9           **THE COURT:**  So you very well could be done with any

10   cy pres procedure necessitated if the bottom number is met.

11          **MR. COOPER:**  Well, it would mean if we did it that

12   way in the -- let's assume that there was $5 million that

13   needed to go in cy pres, we would -- and that there's

14   $2 million still to be received from Mosel, we would

15   contemplate that we'd take $3 million -- would be one way of

16   doing it.  Take $3 million; distribute it cy pres.  And when

17   the other 2 million came in, do a different cy pres.  It might

18   be the same recipients; it might be different recipients.  But

19   that would be one way that you could address the fact that

20   there's -- that you're making a distribution to everyone and

21   there's delay in receiving the funds from Mosel.

22          **THE COURT:**  Okay.  All right.  And you're in

23   agreement, I assume?

24          **MR. BROWNSTEIN:**  Yes, Your Honor.

25          **THE COURT:**  You don't --

1        **MR. BROWNSTEIN:**  We're working hard to try and make

2   this work.  It's obviously been a difficult situation for my

3   client, and working with the 11 banks has been hard.  And I

4   think we really have all the economic terms agreed to, and

5   we're going to reduce it to writing, and Your Honor will see

6   it, the agreement.

7        **THE COURT:**  All right.  Well, as long as it doesn't

8   affect the small claimants, then I would approve a deferred

9   procedure.

10       **MR. COOPER:**  Thank you, Your Honor.

11       **MR. VARANINI:**  Thank you, Your Honor.

12       **MR. COOPER:**  Anything else, Your Honor?

13       **THE COURT:**  Just the orders that were submitted on

14   each of the three motions.  There's going to need to be just

15   little revisions based upon today's discussion.

16       I'd like you to add some reference to the Lodestar

17   cross-check.  Not withstanding the objection that time sheets

18   and line items weren't looked at, I think that an adequate

19   Lodestar cross-check was conducted.  And the final orders don't

20   refer to that specifically, and I think you should refer -- I

21   mean, it's described in the special master's report.  Refer to

22   that.

23       In terms of paragraph 15 of the proposed order granting

24   final approval of the settlements and certifying the class, I'd

25   like you to specify the objections at least with regard to the

1   categories that we talked about today with a little more

2   specificity so that any reviewing court will know that I looked

3   at the objections falling into each of the four categories that

4   I set forth at the beginning of the hearing.  And just provide

5   some specificity.  That's all I'm asking for.

6           **MS. KIRKHAM:**  I actually have a question.  Do you

7   want one order.  We put in three because --

8           **THE COURT:**  I know.

9           **MS. KIRKHAM:**  -- we're required to file an order when

10  we file the motions.

11          **THE COURT:**  I found it to be terribly confusing --

12          **MS. KIRKHAM:**  How about one order?

13          **THE COURT:**  -- that you broke down -- the attorneys'

14  fees is always separate, but the other two I thought could be

15  combined.

16          **MS. KIRKHAM:**  I'll put them together in the revision.

17          **THE COURT:**  And you can still keep the attorneys'

18  fees one separate.  And you will need to make the change in

19  that order with respect to the --

20          **MR. COOPER:**  Percentage.

21          **THE COURT:**  -- the percentage that I've approved.

22      And I think in terms of the continuing and exclusive

23  jurisdiction referred to in page 16, I don't think you refer to

24  the cy pres specifically, the different contingencies.  And I'd

25  like that put in the order as well.

1       And I'd also like the description of how the lower one --

2              **MS. KIRKHAM:**  Okay.

3              **THE COURT:**  -- I forget what you called it.

4              **MS. KIRKHAM:**  The residual.

5              **THE COURT:**  Okay.  The residual contingent cy pres is

6       likely to work.  And the fact that it will result in payment of

7       actual -- the actual amount of the loss.

8       Okay.  So I think with those -- let me just see.  Is there

9       anyone here who wishes to assert an objection to the

10      settlement?  No hands being raised at this time, then I'm

11      prepared to grant final approval.

12      I find the settlement is fair, reasonable, and adequate to

13      the class.  I commend you all for being able to arrive at the

14      settlement.  I know how much work it took.  Frankly, when I got

15      Judge Renfrew's report earlier -- and looked at it earlier this

16      year, I was -- my memory was refreshed as to how complicated

17      the settlement was likely to be.  I simply remember when you

18      presented the partial settlement how unhappy I was with that,

19      and it seems to me that you've answered all of my concerns, and

20      you've actually anticipated all of the objections that were

21      raised, which made it much easier for me to go through the

22      materials.  And so I just want to commend you all.

23      While it's been quite an adventure for me having this case

24      on my docket for 12 years, it will also be very nice to have

25      the matter closed.  I do understand that I will continue to

1    hear from you all from time to time to make sure that things

2    wind down smoothly, but this is probably the last gathering

3    that we will have as a group.  And so I thank you for the

4    experience.  You've done a good job.

5              **DEFENSE COUNSEL TABLE:**  Thank you, Your Honor.

6              **MR. COOPER:**  On behalf of all of us, Your Honor,

7    thank you.

8              **THE COURT:**  You're welcome.

9              **MR. COOPER:**  You've certainly been more than patient

10   with these complications and difficulties, and we appreciate

11   your insights as well.

12             **THE COURT:**  You're welcome.

13             **MR. COOPER:**  I should probably add, Your Honor, in

14   approximately two months, we will arrange for some type of

15   hearing to give you an update with regard to the claims and the

16   cy pres and where we are with that so you'll have an idea.

17             **THE COURT:**  Oh, wait.  Wait.  There's one last thing.

18   The orders are granting final approval.  Oh, right.  And I see.

19   And with final judgment of dismissal with prejudice.

20        So if you resubmit both of those to me today, tomorrow, as

21   soon as you can, we can close out the cases then.

22             **MR. COOPER:**  Yes.

23             **THE COURT:**  All of the cases within the MDL will be

24   closed as well as the ten additional related cases that you've

25   listed on the docket.

1          **MR. COOPER:**  Everything will be gone, Your Honor.

2          **THE COURT:**  Everything will be gone.  Okay.  All

3     right.

4          **MR. COOPER:**  As well as state court cases.  We're

5     going to have to go dismiss all the state court cases as well.

6          **THE COURT:**  Right.  I know.  Good result.

7          **MR. COOPER:**  Thank you, Your Honor.

8          **THE COURT:**  You're welcome.

9        (Proceedings concluded at 10:33 a.m.)

10                         ---o0o---

11    I certify that the foregoing is a correct transcript from the

12    record of proceedings in the above-entitled matter.

13

14    _____     July 3, 2014

15    Signature of Court Reporter/Transcriber    Date
      Sarah L. Goekler

16

17

18

19

20

21

22

23

24

25